**David D. CHAMBERS, (mentally retarded individual) by Gary L. CHAMBERS, brother and legal guardian, Petitioner**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Oct. 22, 2010.

Decided March 4, 2011.

Publication Ordered May 25, 2011.

Gregory M. Strouse, Lock Haven, for petitioner.

Helene Eichenwald Loux, Assistant Counsel, Harrisburg, for respondent.

BEFORE: PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and BROBSON, Judge.

OPINION BY Judge BROBSON.

Petitioner David Chambers (Cham-

bers),[1] by his legal guardian Gary Chambers (Guardian), petitions for review of an order of the Secretary of Public Welfare (DPW) that upheld a decision of DPW's Bureau of Hearings and Appeals (BHA). BHA had sustained the Centre County Mental Health/Mental Retardation Department's termination of Chambers' participation in a program known as Consolidated Waiver.[2] We reverse.

Before addressing the facts in this case, a brief discussion of the Consolidated Waiver program is necessary. As set forth in the ALJ's decision, Section 1915(c) of the Social Security Act, 42 U.S.C. § 1396n(c), permits states to develop programs to enable mentally retarded individuals, who otherwise would be eligible for and placed in an intermediate care facility, to receive services in their home and community. The United States Department of Health and Human Services, Centers for Medicare and Medicaid Services oversees states' implementation of this program.

In Pennsylvania, DPW administers that program through what DPW refers to as the Consolidated Waiver program. The Pennsylvania Office of Developmental Programs (ODP) within DPW administers the Consolidated Waiver for DPW. In performing this function, ODP enters into agreements with "Administrative Entities." An agreement between ODP and an Administrative Entity encompasses a number of responsibilities, including the development of an "individual support plan" (ISP) for individuals who are approved to participate in a Consolidated Waiver program. The Administrative Entity must monitor the performance of the ISP in order to ensure that the covered individual

is healthy and safe. The particular operating agreement determines the nature and regularity of the monitoring that the Administrative Entity must perform.

Personnel of the Administrative Entity, known as "support coordinators" (SCs), undertake the duty to monitor a covered individual's health and safety in accordance with the agreement. For participants in the Consolidated Waiver who receive monthly service, the designated SC must engage in a minimum of three face-to-face monitoring visits with the participant every three calendar months. The minimum three visits must include an in-home visit, a visit to the location where the participant obtains "day service," and a visit to any place to which the participant agrees. ODP has designated Centre County Mental Health/Mental Retardation Services (County Services) as the Administrative Entity for the Consolidated Waiver program in Centre County. In this case, the Guardian provides care for David and is reimbursed for his services under the Consolidated Waiver program.

County Services sent a notice to the Guardian on July 9, 2009, indicating that it was terminating Chambers' participation in the program based upon its belief that the Guardian had failed to cooperate with regard to scheduling and completing required "monitoring." On July 22, 2009, the Guardian, on behalf of Chambers, sought to challenge the termination by filing a request for a hearing. The ALJ conducted a telephone hearing on October 28, 2009, during which County Services presented the testimony of Deborah Tate, an Assistant Administrator for County Services' Mental Retardation Services, and

---

1. Chambers is an adult with mental retardation. He lives with his brother, Gary Chambers.

2. In accordance with DPW's regulations, an Administrative Law Judge (ALJ) issued a decision, and BHA's Chief Administrative Law Judge issued an order affirming the ALJ's decision.

Carol Waltz, the Administrator for County Services. County Services did not offer the direct testimony of Chambers' SCs or others who were involved with the scheduling and performance of monitoring visits. The Guardian testified on behalf of Chambers.[3]

The ALJ issued a decision in which he rendered factual findings, which we now summarize. On May 8, 2008, Chambers' SC went to his home. (ALJ's decision, Finding of Fact (F.F.) 4.) The Guardian keeps his door locked in order to prevent Chambers from exiting his home because of an earlier incident in 2005 when Chambers exited the home. (*Id.*, F.F. 6.) On May 8, 2008, the SC and SC supervisor could not exit Chambers' home because the door was locked. (*Id.*, F.F. 5.) On June 23, 2008, the SC and her supervisor appeared at the home for monitoring purposes. (*Id.*, F.F. 10.) Although the Guardian did not prevent the SC and her supervisor from entering the home, they could not or would not enter the home because of the incident on May 8, 2008, and they requested the Guardian to bring Chambers outside. (*Id.*, F.F. 10.) The Guardian refused to bring Chambers outside because of concerns for Chambers' safety. (*Id.*, F.F. 11.)

The SC attempted to contact the Guardian by phone in order to reschedule a monitoring session set for August 21, 2008. (*Id.*, F.F. 21.) The SC also made repeated phone calls to the Guardian between October 2, 2008 and October 22, 2008, in order to schedule a monitoring session for October 28, 2008. (*Id.*, F.F. 13.) The SC sent certified letters to the Guardian during that period in October in an attempt to contact the Guardian in order to set up a monitoring session for October. (*Id.*, F.F. 14.) The certified letters were returned to the County as unclaimed. (*Id.*, F.F. 15.) On October 28, 2008, the Guardian left a voice message with the SC, seeking to set up a monitoring session for that evening. (*Id.*, F.F. 17.) The SC left a message for the Guardian to call back and confirm the meeting. (*Id.*, F.F. 18.) The Guardian did not confirm the meeting as requested, and the SC did not go to the meeting site. (*Id.*, F.F. 19.) The SC made several attempts to contact the Guardian to schedule a monitoring session in November 2008. (*Id.*, F.F. 16.)

The Guardian and the SC reached an agreement on November 5, 2008, that the key to the home would always be accessible during monitoring visits. (*Id.*, F.F. 20.) The SC completed a home monitoring visit on November 28, 2008. (*Id.*, F.F. 22.) The Guardian and Chambers were away on vacation between December 7 and December 21, 2008. (*Id.*, F.F. 24.) The SC called the Guardian on December 29, 2008, in order to set up a monitoring visit on December 30, 2008. (*Id.*, F.F. 23.)

The Guardian called the County on January 15, 2009, requesting a new SC. (*Id.*, F.F. 25.) Ms. Waltz informed the Guardian on the same date that the County would not assign a new SC to Chambers. (*Id.*, F.F. 26.) On January 29, 2009, the Guardian called the SC to cancel a monitoring session that was scheduled for January 29, 2009. (*Id.*, F.F. 27.) County Services sent a letter to the Guardian on March 5, 2009, confirming that it was denying his request for a new SC. (*Id.*, F.F. 28.) The SC sent a certified letter to the

---

**3.** The Guardian did not have legal counsel during the telephonic hearing. The ALJ swore in all the witnesses, including the Guardian, at the beginning of the hearing. Acting pro se, the Guardian offered responses and colloquy to and during the other witnesses' testimony. He provided a brief testimonial response toward the end of the hearing, during which the ALJ posed certain questions to him.

Guardian on March 5, 2009, directing him to contact her by March 19, 2009, to schedule a monitoring visit. (*Id.*, F.F. 29.)

Ms. Waltz sent notice to the Guardian on July 9, 2009, proposing to terminate Chambers' participation in the Consolidated Waiver program. (*Id.*, F.F. 30; Exhibit C–2.) The Guardian appealed the notice on July 22, 2009. (*Id.*, F.F. 31.) The ODP issued a notice to the Guardian dated August 31, 2009, indicating that it concurred with the County's decision to terminate Chambers' participation in the Consolidated Waiver program. (*Id.*, F.F. 32; Exhibit C–5.)

The ALJ concluded that County Services satisfied its burden under the regulations to establish that uncooperative behavior on the part of a participant precluded the office from performing its duties to monitor under the waiver agreement and regulations. Chambers filed an application for reconsideration with the Secretary of Public Welfare, who granted reconsideration, but ultimately adopted the ALJ's decision. Chambers petitions for review from the Secretary's final order.

■ Chambers raises the following issues in his appeal: [4] (1) whether the notice DPW sent to Chambers provided insufficient notice regarding the allegations forming the basis for the termination; (2) whether procedural deficiencies preceding the hearing on Chambers' challenge to the termination (including failure of the County to supply a requested witness list, the ALJ's refusal of Guardian's requests for subpoenas of fact witnesses, and the ALJ's refusal to grant Guardian's request for a continuance) constituted a denial of due process; (3) whether the manner in which the ALJ conducted the hearing, and particularly, his failure to permit Guardian to complete cross-examination of a witness, violated Chambers' due process rights and applicable DPW hearing regulations; and (4) whether the ALJ's necessary factual findings are not supported by substantial evidence, but rather, uncorroborated hearsay evidence.

■ We will begin by addressing Chambers' claim that the ALJ's necessary factual findings are not supported by substantial evidence, which we view as determinative of his appeal.

■ Chambers asserts that the evidence upon which the ALJ relied constitutes uncorroborated hearsay and, thus, there is no substantial evidence to support the ALJ's necessary factual findings. The classic definition of hearsay is "an out-of-court statement offered to prove the truth of the matter asserted." *Six L's Packing Co. v. Workers' Comp. Appeal Bd. (Williamson)*, 2 A.3d 1268, 1275 (Pa.Cmwlth.2010). Although an adjudicator may consider the natural probative value of *corroborated* hearsay evidence to which an opposing party does not object, factual findings will not stand if they are based solely on hearsay. *Id.*

The ALJ based his factual findings largely on the testimony of Ms. Tate and Ms. Waltz. Chambers contends that these

---

4. DPW asserts in its brief that our review is limited to considering whether the Secretary abused her discretion, as in cases where a petitioner challenges the denial of a request for reconsideration. In this case, however, the Secretary *granted* Chambers' request for reconsideration and then later upheld the ALJ's decision. Chambers petitions for review of the Secretary's final order upholding the ALJ's decision. In such cases, our review extends to questions including whether substantial evidence supports necessary factual findings, whether the Secretary erred as a matter of law, and whether the petitioner's constitutional rights were violated. *Gibbs v. Dep't of Pub. Welfare*, 947 A.2d 233 (Pa. Cmwlth.2008), *appeal denied*, 600 Pa. 756, 966 A.2d 572 (2009).

witnesses' testimony consists mainly of hearsay. This argument is confirmed by a review of the testimony. Ms. Tate provided significant testimony concerning the particular incident that occurred on May 8, 2008, when the Guardian allegedly kept his door locked, and the other allegations that the Guardian did not cooperate in setting up monitoring visits. Ms. Tate indicated that she was referring to notes while providing her testimony. The record indicates that either DPW or County Services maintains a data base into which SCs enter "notes" detailing communications and events relating to their job responsibilities. The record suggests that Ms. Tate relied upon the substance of those "notes" in order to testify.

Further, Ms. Tate regularly used the expression "we," as in County Services, in referring to the matters about which she testified. Ms. Tate never used the first person pronoun "I" in rendering her testimony, and no testimony suggests she had first-hand knowledge of the facts to which she testified. Based upon these factors, we conclude that her testimony in large part consisted of her reference to other persons' notes rather than her own personal experience. DPW does not dispute this.

Some of the testimony appears not only to constitute hearsay (her statement of what another person state in a note), but double hearsay in that Ms. Tate was testifying regarding another person's recollection of statements the Guardian made.[5]

DPW also argues that the ALJ relied upon other corroborative evidence in crafting his factual findings. DPW notes that the ALJ observed (and apparently determined) that the Guardian admitted that on an occasion when he and Chambers were scheduled to meet the SC at a restaurant, he saw the SC waiting in the lobby of a restaurant, but did not seek to inform her that he and his brother were already in the restaurant. The Guardian admitted that he watched the SC for one-half hour, at which point the SC left. The ALJ commented that the Guardian did not explain why he acted in this manner. The ALJ was entitled to view that testimony in a manner unfavorable to Chambers, and accordingly, we agree with DPW that substantial evidence does support the ALJ's factual finding regarding the Guardian's failure to make contact with the SC while she was waiting for him. We cannot, however, conclude that this isolated fact pro-

---

**5.** DPW argues that Chambers "ignore[s] both Ms. Tate's and Ms. Waltz's job responsibilities and the knowledge they would have as a result of their responsibilities." (DPW's Brief at 22.) Although those witnesses may have knowledge relating to Chambers and the Guardian's conduct, that knowledge is not first-hand knowledge, but rather knowledge based upon the first-hand experiences of others. Those witnesses' understanding of events, which is based upon the first-hand knowledge of *others*, does not render their testimony non-hearsay. DPW also asserts that the letter Ms. Waltz wrote informing Chambers of the termination demonstrates that she has first-hand knowledge. For the obvious reasons described above, we repeat, knowledge of facts gained from the recitation of another person's first-hand experience does not provide a person who was not involved in the specific experience with first-hand knowledge. We also point out that the notes may have fallen within the business records exception to the hearsay rule under Section 6108 of the Judicial Code, 42 Pa.C.S. § 6108. In order for that exception to apply, however, a party has to move for the admission of the records after laying a proper foundation. Section 6108(b) of the Judicial Code. Additionally, while the rules of evidence do permit a witness to use writings to help refresh a memory, Pa. R.E. 612, these notes were not the writings of the witness, and that particular rule requires that the party against whom the evidence is offered must have an opportunity to examine the writings. Otherwise, the party against who the evidence is offered will have no opportunity to use the writings as a means to attack the testimony.

vides a sufficient basis for the ALJ to determine that the Guardian was uncooperative.

DPW also points out that the Guardian admitted in his testimony that there had been no monitoring between January 1, 2009 and July 2009. DPW asserts that the Guardian's failure to explain why he did not respond to the County's attempts to schedule monitoring (through certified mail and telephone calls) supports the ALJ's factual findings regarding the Guardian's alleged lack of cooperation. In considering this argument, however, we must begin by observing that there is nothing but hearsay evidence supporting the ALJ's basic factual finding that County Services sent letters and made phone calls trying to set up monitoring visits. The Guardian testified that he never received the letters or phone calls. Even if the ALJ elected not to credit the Guardian's testimony, there is still no other positive evidence that corroborates the hearsay testimony regarding County Services' alleged attempts to communicate. This evidence was, therefore, insufficient to support the ALJ's factual findings regarding the communication.[6]

Based upon the foregoing, we conclude that there is no substantial evidence to support the ALJ's necessary factual findings.

Accordingly, we reverse the Secretary's order affirming the ALJ's decision.[7]

---

6. *See Kyu Son Yi, DVM v. State Bd. of Veterinary Med.,* 960 A.2d 864, 875 (Pa.Cmwlth. 2008) ("It was the Board's prerogative to reject all witness testimony, but it was then left without any positive evidence. The remaining 'evidence' consists solely of a negative inference from a statement not found credible. This is ephemeral, not substantial evidence, which, at best, supports a suspicion ... even the Board acknowledged that in the absence of 'any positive evidence,' it could not find that Dr. Yi did not offer to do an x-ray.") (Internal citations omitted.)

7. Because we reverse the Secretary's order on the basis that substantial evidence does not exist to support the necessary factual findings, we need not address Guardian's remaining arguments.

*ORDER*

AND NOW, this 4th day of March, 2011, the order of the Secretary of Public Welfare is REVERSED.