# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Department of Public Welfare    :
    :
    v.    :
    :
Mikeisha Gant,    :    No. 1652 C.D. 2014
    Appellant  :    Argued: June 15, 2015


BEFORE:    HONORABLE MARY HANNAH LEAVITT, Judge[1]
    HONORABLE PATRICIA A. McCULLOUGH, Judge
    HONORABLE ANNE E. COVEY, Judge


OPINION BY
JUDGE COVEY    FILED: June 29, 2016


Mikeisha Gant (Gant) appeals from the Lancaster County Common Pleas Court's (trial court) July 8, 2014 order declaring that Gant is a medically-compromised adult in need of protective services under the Adult Protective Services Act (Act or Act 70)[2] and granting the Department of Public Welfare's (DPW)[3] Petition for Special Relief (Petition). The issues for this Court's review are: (1) whether the trial court erred in finding that Gant is an adult in need of protective services under the Act; (2) whether the trial court erred by restricting

---

[1] This case was assigned to the opinion writer before January 4, 2016, when Judge Leavitt became President Judge.

[2] Act of October 7, 2010, P.L. 484, 35 P.S. §§ 10210.101-103, 301-309, 501-507, 701-704 (effective April 7, 2011).

[3] Effective November 24, 2014, DPW was officially renamed the Department of Human Services. *See* Act of June 13, 1967, P.L. 31, added by Section 2 of the Act of September 24, 2014, P.L. 2458, 62 P.S. § 103(a) (effective November 24, 2014). However, because this appeal was filed prior to the official name change, we will refer to Appellee as DPW herein.

Gant's eligibility for DPW's Medical Assistance benefits; (3) whether Gant was afforded sufficient notice that DPW would seek to enjoin interference with Gant's ability to consent to protective services; and, (4) whether DPW and the trial court deprived Gant of her due process rights. Upon review, we affirm in part, reverse in part and vacate in part.

## BACKGROUND

Gant, who was 28 years of age at the time of the hearings, suffers from advanced-stage sickle cell anemia which causes her consistent, severe pain. She is bed-ridden and catheterized, and is fed every two hours through a feeding tube. She must also be moved every two hours in order to avoid pressure wounds (*i.e.*, bedsores).[4] Gant takes a significant amount of medication, including pain medications. Since 2011, she has participated in DPW's Consolidated Waiver Program (Waiver Program),[5] which permits Medical Assistance recipients to receive nursing home-type care and services in their homes. Within the Waiver Program are two service models: the Agency-Directed Model and the Consumer-Directed Model. Under the Agency-Directed Model, independent home healthcare

---

[4] Pressure wounds occur when blood and oxygen are impeded from getting to tissue and it begins to die. The wounds begin superficially but, as pressure remains, they get deeper. *See* Reproduced Record (R.R.) at 67a.

[5] The federal Medicaid program authorizes states "to offer, under a waiver of statutory requirements, an array of home and community-based services that an individual needs to avoid institutionalization." 42 C.F.R. § 441.300; *see also* 42 U.S.C. § 1396n(c). Essentially, the federal government "waives" certain regulations for community-based programs under which intermediate care facilities are required to operate. The Commonwealth's Medical Assistance program is authorized by Article IV of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended,* 62 P.S. §§ 401–493, and must be administered as required by Title XIX of the Social Security Act, 42 U.S.C. § 1396-1396(w-5), and any associated regulations. *See* 55 Pa. Code § 1101.11(b).

2

service providers employ persons responsible for the recipient's care.[6] Under the Consumer-Directed Model, a DPW service coordinator (SC) assists the recipient in developing an individual support plan under which the recipient employs care workers which, oftentimes, are family members.[7] Pursuant to Gant's Individual Support Plan revised in July 2013, her primary care was provided under a Consumer-Directed Model by her mother Abadella Gant (Mother), and occasionally by Gant's father Michael Gant (Father) who is also her power-of-attorney (POA).

In October 2013,[8] Gant was transported to Lancaster Regional Medical Center's (LRMC) emergency room in critical condition due to a severe, pervasive infection caused by feeding tube leakage, and approximately 11 pressure wounds on her stomach, chest, back and head sufficiently deep to reach her bones. While there, she became unresponsive, stopped breathing and had to be intubated. LRMC staff also discovered that Gant was malnourished and dehydrated. On October 24, 2013, Gant coded and had to be resuscitated. She was unable to receive and/or communicate information or consent to treatment. Due to LRMC's inability to keep an intravenous line in place for delivery of necessary antibiotics,

---

[6] "Agency-Directed" does not mean DPW-directed, but rather independent in-home care agency-directed. Family members may qualify to participate in a recipient's care under the Agency-Directed Model. *See* R.R. at 80a-81a; *see also* DPW Br. at 4

[7] *See* Section 103 of the Act (service plan defined). 35 P.S. § 10210.103.

If DPW determines that a recipient is not receiving sufficient care under the Consumer-Directed Model, it may switch the recipient to an Agency-Directed Model to ensure that proper in-home care is provided by skilled personnel. *See* R.R. at 66a.

[8] The exact date is not evident from this record. DPW's October 18, 2013 records reflect that she was admitted at least as of that date. *See* Supplemental Reproduced Record (S.R.R.) at 28b.

LRMC staff recommended that Gant be transferred to Hershey Medical Center.[9] Mother purportedly refused to permit the transfer. Based upon Gant's condition and Mother's refusal, LRMC requested that DPW's Under-60 Protective Services Unit[10] conduct an investigation.

On October 24, 2013, DPW sought an emergency order from the trial court's Orphan's Court Division (Orphan's Court) at Docket No. 2377 of 2013, seeking DPW agent Denise Getgen's (Getgen)[11] appointment as Gant's emergency guardian "in order to insure placement and admission to Hershey Medical Center and to consent to all necessary medical interventions on [Gant's] behalf . . . ." Reproduced Record (R.R.) at 18a. DPW's Petition for Adjudication of Incapacity and for the Appointment of a Plenary Guardian of the Person and of the Estate (Guardianship Petition) reflected:

> 3. [DPW's] [U]nder[-]60 [P]rotective [S]ervice [U]nit[] received a report of need on or around October 24, 2013 requesting an investigation of the care and services provided to [Gant] at the time of her admission to [LRMC]. Despite receiving waiver services through [DPW,] [Gant] **was in deplorable physical condition**.
>
> 4. Upon admission, it was observed [Gant] had multiple stage 4 skin wounds, had a **severe infection** of the blood,

---

[9] Because of Gant's condition, her medications had to be delivered directly into her bones, rather than into her veins.

[10] DPW's Under-60 Protective Services Unit provides protective services for adults aged 18 to 59 in accordance with the Act. *See* R.R. at 64a; *see also* 35 P.S. § 10210.103. "Protective services" are defined in Section 103 of the Act as "[t]hose activities, resources and supports provided to adults under this [A]ct to detect, prevent, reduce or eliminate abuse, neglect, exploitation and abandonment." 35 P.S. § 10210.103.

[11] Getgen is the Chief of the Commonwealth Department of Aging's Consumer Protection/Protection Services Division. However, she became a DPW agent under a memorandum of understanding between DPW and the Department of Aging, and has been assisting DPW with its implementation of the Act. *See* R.R. at 64a.

was **severely dehydrated** and **malnourished** and had a leaking feeding tube in her abdomen. . . .

5. Despite there being no cost due to insurance coverage, [Gant]'s mother and caregiver would not permit physician[-]ordered nursing visits in the home. [Gant] requires a skilled level of care and is unable to perform any activities of daily living and instrumental activities of daily living.

6. [Gant] has repeatedly been hospitalized in February 2011, September 2012, and November 2012, at Lancaster General Hospital for infection and dehydration.

7. [Gant] suffers from severe sickle cell anemia, seizure disorder, contractures, multiple decubitus ulcers, chronic and extreme physical pain that is currently being managed with narcotic medications and receives nutrition through a feeding tube. . . . [Getgen] will testify concerning [Gant]'s medical conditions and lack of capacity at this time. **[Gant] is unable to communicate or process information at this time.**

. . . .

9. . . . [O]n October 24, 2013, the family was informed [LRMC was] unable to deliver pain medication through veins due to the severity of her sickle cell anemia. In fact, pain medication had to be administrated through [Gant]'s bones. **All professionals involved in this matter . . . believe [Gant] must be transported, on an emergency basis, to Hershey Medical Center**, [which is] better able to care for [Gant]'s extensive needs and pain management. [Gant]'s caregivers and **parents refuse to permit this to occur**[,] indicating no one understands the situation. [Gant]'s mother offered that all that needed to be done was to flush pain medications into the feeding tube, which is not an option. [Gant]'s pain is excruciating, her wounds are significant and **she will potentially die**[] **if the appropriate treatment is not emergently administered**.

10. [DPW] believes that [Gant] is **at risk and will suffer irreparable harm** as a result of her stage 4 ulcers, severe infection and no intravenous access. Any one of these issues **could lead to her death**. [Gant] needs immediate placement in a medical center equipped to deal with her significant medical issues in order to sustain her life.

11. [Getgen], as agent for [DPW] [O]ver[-]60 [P]rotective [S]ervices [U]nit, shall be appointed temporary emergency guardian of [Gant]'s person and estate in order to insure placement and or admission to Hershey Medical Center and to consent to all necessary medical interventions on behalf of [Gant] who is only 28 years of age. At the time of a permanent hearing, a guardianship agency will in all likelihood need to be appointed.

WHEREFORE[, DPW] respectfully requests this Court to direct a citation to [Gant], as to why she should not be adjudicated an incapacitated person and an emergency and plenary guardian of her person and estate be appointed.

R.R. at 17a-19a (emphasis added). Appended to the Guardianship Petition were photographs of Gant and her wounds, and copies of Gant's Lancaster General Hospital records. *See* R.R. at 17a, 20a-28a. Based upon her investigation, Getgen verified that the statements contained in the Guardianship Petition were true and correct to the best of her knowledge. *See* R.R. at 29a.

By October 26, 2013 order, the Orphan's Court appointed Linda Timberlake, Esquire as Gant's counsel, scheduled an emergency hearing for later that day and a permanent hearing for October 28, 2013. *See* R.R. at 11a. An

6

emergency hearing was held[12] and, by October 26, 2013 order, Getgen was appointed Gant's temporary emergency guardian. *See* R.R. at 44a. Gant was transferred to Hershey Medical Center that day. The Guardianship Petition was filed with the Orphan's Court on October 29, 2013. On November 1, 2013, the Orphan's Court issued a Preliminary Decree scheduling the Guardianship Petition hearing for December 4, 2013, which was later continued and, ultimately, cancelled.[13] *See* R.R. at 9a-10a, 13a-15a.

On November 8, 2013, Gant was transferred from Hershey Medical Center to Select Specialty Hospital in Harrisburg for rehabilitation. On November 21, 2013, Robert Howse, M.D. evaluated Gant's capacity. He concluded that, with the exception of Mother's and Father's difficulty maintaining relationships with doctors or institutions sufficient to provide Gant stable and reliable access to medically-necessary opioids and the withdrawal that occurs as a result, Gant is completely capable of making her own choices regarding her care and has not been the victim of physical abuse or neglect.

By December 11, 2013 letter, DPW terminated Gant's Waiver Program services.[14] *See* R.R. at 119a. Also on December 11, 2013, DPW filed the

---

[12] The trial court's opinion reflects: "There is no transcript of this hearing. It is this Court's understanding that it was held without a Court Reporter being present." Trial Court Op. at 3.

[13] The Petition reflects that the December 4, 2013 guardianship hearing was continued. *See* R.R. at 4a. The trial court's opinion states that the guardianship proceeding was cancelled, and that DPW filed a motion to withdraw the temporary emergency guardianship on December 20, 2013. *See* Trial Court Op. at 4. At the February 27, 2014 hearing, DPW's counsel acknowledged that since Gant's capacity was redeemed after her hospitalization, the Guardianship Petition was no longer before the trial court. *See* R.R. at 64a.

[14] The notice was not made part of the record before this Court. DPW's counsel stated at the June 16, 2014 hearing that DPW did not provide Waiver Program services in Gant's home after December 20, 2013, when Gant appealed her Waiver Program termination to DPW's

7

subject Petition seeking an order "permitting [DPW] to continue to direct [Gant's] health care pending a hearing,"[15] because "[w]ithout the involvement of the [trial c]ourt, under the [Act's] emergency intervention procedures, [Gant] will return home and not have the skilled care she needs and this time she may not survive." R.R. at 8a. By December 13, 2013 order, the trial court authorized Getgen "to consent to medical treatment and selection of treatment and care providers for [Gant], to insure she receives proper medical treatment, pending further [o]rder of th[e] Court." R.R. at 45a. On January 31, 2014, the trial court scheduled a hearing on the Petition and appointed Patricia L. Dunlevy Williams (Dunlevy Williams), Esquire as Gant's counsel. Due to her significant improvement, Gant was released from Select Specialty Hospital in February 2014.[16]

A hearing was held on February 27, 2014, at which Getgen, Bayada Home Care nurse Montsho Garman (Garman), and DPW's Office of Long-Term

---

Bureau of Hearings and Appeals (BHA). *See* R.R. at 66a, 119a; *see also* Trial Court Op. at 4. The trial court stated: "The record does not reflect the status of the administrative appeal regarding [DPW's] termination of Waiver Services." Trial Court Op. at 4 n.4. DPW was nevertheless still involved in Gant's medical care. Getgen explained:

> When an appeal is filed, what we sort of agree to, the [f]ederal [g]overnment, [sic] is that we would provide some level of service while that appeal is pending. So, typically, the person gets either the level of service that they were getting; although, it might not be the same model of service needed. . . . We had a meeting [February 26, 2014] about attempting to put in Agency[-Directed] Model services.

R.R. at 66a.

[15] Although not specified in the Petition, DPW contends that its purpose was to enjoin Mother's interference with Gant's services pursuant to Section 304(c) of the Act. *See* R.R. at 119a-123a. DPW's argument is primarily in support of an injunction, even though it did not expressly seek an injunction, or address the legal standard for an injunction. *See* DPW Br. at 2, 9.

[16] The exact date is not evident from the record.

8

Living director Virginia Rogers (Rogers) testified for DPW. Getgen reported that she observed Gant in critical condition at LRMC, was "pretty hands-on" regarding her medical care, and had significant interaction with Gant's medical care providers at LRMC, Hershey Medical Center and Select Specialty Hospital. R.R. at 65a. She explained that the LRMC doctors presented her with two options when they could not gain intravenous access – do nothing and provide Gant hospice care, or treat her infection aggressively at Hershey Medical Center. Since she understood that Hershey Medical Center was Gant's best option, she authorized the transfer. Getgen described:

> [Gant] was not receiving adequate care and services . . . to make sure her nutrition was maintained, make sure that she did not develop or minimize the risk of developing pressure wounds or open sores, have things like medication . . . delivered properly, those kinds of things. I know that there were issues with all of that.

R.R. at 65a. Getgen declared that she discussed her decision-making with Gant when Gant was able to communicate, but when Gant declined certain treatment that physicians deemed necessary, Getgen nevertheless authorized it. She explained that DPW sought "involuntary intervention because the refusals and the care and services that were not being provided really did put [Gant] at risk of death, serious physical injury, or serious bodily injury." R.R. at 72a.

Getgen stated that when Gant was returned home in February 2014, her physical condition no longer constituted an emergency; however, due to her previous condition and her significant medications, DPW explored re-entering her in the Waiver Program under the Agency-Directed Model to ensure that she continued to receive proper care. Specifically, she described that DPW outfitted Gant with a special pressure-relief mattress and other durable medical equipment,

9

retained Bayada to provide additional nursing services including repositioning, and wound and feeding tube care, and recommended social services intervention to ensure that Gant's medications were obtained, stored and delivered properly.

Getgen clarified that despite taking narcotic pain medications, Gant's pain is constant, and to avoid it becoming more severe, Gant is medicated prior to wound care, repositioning and therapy. Getgen reported that Gant's parents resisted the additional nursing services and medication dispensing devices, and consistently failed to answer inquiries regarding Gant's care plan. She stated that, on February 26, 2014, Getgen, the Gants, Rogers, Garman, DPW Support Coordination staff and Gant's treating physician Peter A. Hurtubise, D.O.'s (Dr. Hurtubise) nurse practitioner Polly Sue Gockley (Gockley), met to discuss Gant's care plan and the possibility of reinstating her to the Waiver Program under the Agency-Directed Model. Getgen expressed that although no consensus was reached, she was able to observe that with the DPW-ordered home nurse aides and physician support, Gant's condition had not deteriorated, and that she was "very much the same as she was at Select Specialty [Hospital]." R.R. at 68a.

Getgen acknowledged that Gant was not currently in an emergency situation, and that private in-home service agencies could effectively provide Gant's care. However, she testified:

> I continue to be concerned that she is not getting turned and repositioned adequately to ensure that she doesn't develop pressure sores, and we go backwards and the pressure sores deteriorate again.
>
> I continue to be concerned about the level of medication she's getting, and ensuring that she's getting the right medicine at the right time. . . .

10

> I do get concerned when we don't get responses in terms of, how is it going in the house? Or we get a response that's not accurate . . . . If we can't get a good collaboration or cooperation, if we can't get people in-house consistently, if we can't get meds being given in the manner that they're directed . . . to be given, those are big concerns still.

R.R. at 68a-69a. Thus, she asserted that DPW's oversight is necessary to be sure that Gant's care plan is consistently implemented. She acknowledged that DPW's oversight would be unnecessary if it was satisfied that Gant's care plan was met without resistance and that her condition did not decline. She related that the Agency-Directed Model protects Gant in that the home health agencies would notify DPW of abuse and/or signs of neglect. Getgen agreed that DPW could be satisfied if Gant presented a care plan approved by the trial court; however, Gant has never taken that step.

Garman testified that she cared for Gant three times weekly for approximately four weeks prior to the hearing, under a care plan prepared by Dr. Hurtubise.[17] She described that Mother often interrupted her interactions with Gant and answered for her, particularly in refusing treatment and repositioning. She described explaining Gant's need for repositioning not only to prevent sores but to prevent breathing problems, and then documenting the refusals. Garman articulated that Mother was defensive when she attempted to determine if Mother was familiar with a particular procedure necessary for Gant's care.

---

[17] Garman reported that, at the February 26th meeting the evening before the hearing, Dr. Hurtubise reduced her visit frequency to twice weekly because Gockley was going to provide wound care one day per week.

11

Regarding Gant's medications, Garman stated:

Medications have been an issue in this home. There have been two times -- I introduced something called a Mediplanner. It allows you to, me as the nurse, to come in one time during one of my visits during the week and pre-fill the med box for morning, noon, evening, and nighttime with all of the meds, so that [Mother] would be able to administer the medications at specific times.

There have been two occasions where the Mediplanner was incorrect when I came back. One day I came back and all of the morning and noon across the board from Sunday to Saturday were just completely missing. And then all the evening pills from evening to bedtime were present.

And with the amount of narcotics and the fact she's on Dilantin for seizures, gabapentin for pain, these types of medications can't really be missed, so I was alarmed. And when I tried to speak to [Mother] about it, she actually ignored me during that particular visit.

The next time I visited, there was another occasion where I noticed that the Oxycontin – there were three Oxycontin in two of the slots in the evening, and she's only supposed to take two. The Dilantin was -- the bottle had changed 200mg tablets were previously ordered and now there were 100mg tablets in the home. She's supposed to get 400mg, so that changes the number of tablets that are going to be in [the] Mediplanner. [Mother] told me that she moved those around.

So I think that there's a cognitive problem with her understanding the patient's basic medication regimen. And that's a safety issue that I had to report to Dr. Hurtubise. . . . It has nothing to do with [Gant] personally. Anytime there [are] discrepancies in the

Mediplanner when I come, I have to report that to the physician.

R.R. at 76a. She described that since her goal is for the family to be independent, she repeatedly attempted to teach Mother how to use the Mediplanner, but was met with verbal abuse.

Garman reported that Mother's repeated speaking for Gant was a "red flag" that abuse may be occurring. R.R. at 77a. She acknowledged that although Gant is not currently in an emergency situation, based upon her observations, it would be unsafe for Gant to remain in her home with Mother as her primary caregiver. Garman recalled that, on approximately three occasions, Mother called and told her not to come and, on other occasions, Mother made her wait for extended periods of time before affording her access to Gant. She also referenced an incident on February 26th in which Mother pulled her into the bathroom, locked the door and asked her not to testify at the February 27th hearing. Garman declared that neither she nor Bayada are willing to continue serving Gant under such conditions.[18]

Rogers testified that although she did not meet Gant until February 26th, she was familiar with Gant's Individual Support Plan, which a DPW SC was assisting the Gants to execute. *See* Supplemental Reproduced Record (S.R.R.) at 2b-25b. She related that she was also familiar with the SC's notes, which reflected that there had been difficulties with the Gant family's cooperation, and that Mother questioned why the SC had to visit so often since "her daughter is terminally ill and . . . her health is not going to get better and it is a waste of [their] time for SC to bother them all of the time." R.R. at 82a. Rogers recalled that Gant was not

---

[18] According to the record, although Garman was eventually replaced, Bayada still provides Gant's care. *See* R.R. at 117a.

13

interested in having people she did not know provide her services, but stated that it would be agreeable, if she got to know the people involved. *See* R.R. at 83a. Based upon her interactions with the family, Rogers opined:

> I believe that [Gant] is a very vulnerable person. She is essentially in her room 24 hours a day with no access to open the door to anybody else. Her parents are there, so I think that there is the possibility that she may not have the opportunity sometimes to make her own decisions. So I think that that is one reason why she is not a good candidate for self-direction [as required by the Consumer-Directed Model].

R.R. at 82a. After Rogers' testimony, the trial court continued the February 27, 2014 hearing.

The Petition hearing was scheduled to resume on March 21, 2014. *See* R.R. at 47a. However, rather than conducting a hearing that day, off-the-record settlement discussions occurred. *See* R.R. at 49a. After the parties failed to reach an agreement, Father filed a Petition for Hearing Final Portion of Hearing on April 11, 2014. Therein, Father also asked the trial court to permit Dunlevy Williams to withdraw in lieu of private counsel Eric Schelin Rothermel's appearance. Additionally, Father requested the trial court to vacate Getgen's authority based upon the evidence presented at the February 27, 2014 hearing. *See* R.R. at 48a-52a. By April 24, 2014 order, the trial court scheduled the hearing to continue on June 16, 2014 and approved Gant's counsel change, but did not vacate Getgen's authority. *See* R.R. at 53a.

On June 16, 2014, Gant, her parents and Dr. Hurtubise testified on Gant's behalf. Gant related over the telephone that because her blood cells are sickle-shaped, they do not flow properly and the resulting lack of oxygen makes her feel weak and causes her excruciating pain. She recalled that she has

14

experienced symptoms and been hospitalized regularly since she was two years old. She described that she has been bed-ridden for five or six years, she takes numerous medications through her feeding tube every two hours, she is on oxygen, she is catheterized and uses a feeding tube and, as a result, her parents must help her brush her teeth and bathe, etc.[19] She explained that she must lie on her side because she experiences more pain when on her back. Gant stated that her mother feeds her, dispenses her medications, and cares for her wounds on days the nurses are not scheduled.

Gant stated that, before her October 2013 hospitalization, Dr. Stuart Hartman (Dr. Hartman) visited her monthly, Dr. Hurtubise visited her every two or three months, and a nurse visited regularly to check her vital signs and care for her wounds. Gant recalled that in the days leading up to her October 2013 LRMC admission, her feeding tube began leaking uncontrollably which caused her skin to soften and tear and the feeding tube to dislodge. She described that she could not eat, she lost weight and her medications could not be regulated. She does not recall her treatment at LRMC, but recalls being intubated when she arrived at Hershey Medical Center, and the staff drilling a hole into her knee to administer antibiotics.

Gant recounted an incident at Select Specialty Hospital when she was experiencing back pain and Getgen informed her that she was to undergo a CAT scan. She asked Getgen to delay the test because she was in such pain that her legs were contracting. She reported that Getgen nevertheless authorized the test, and

_____

[19] Gant reported that in addition to her symptoms, she has no feeling in her left foot, and multiple infarcts all over her body. Infarcts result from the abnormal blood cells coagulating and cutting off blood and oxygen supplies to the bones, causing severe pain. *See* R.R. at 97a.

15

when the staff pushed her contracted legs to flatten them out, she was screaming in pain and crying.[20] She also recalled Getgen reducing her family's visiting hours, but bargaining that if she sat in a chair, her visiting hours would be restored and/or the Waiver Program issues would be dropped. She recollected Getgen telling her that she did not want to be Gant's guardian, and she only visited Gant once since she returned home.

Gant described that since her February 2014 return home, she receives nursing care three times per week, and Dr. Hurtubise visits her. She expressed:

> I want to be able to make decisions for me on my own. I don't need a guardian. I'm 29 years old. I don't need anybody to make decisions for me, medically or anything.
>
> And on top of that, I want to be able to have whoever I want to hire. I feel like it should be my choice who I want to come in, and I want my [M]other to be my care giver. And I don't understand why it has to be that way because we've done nothing wrong.

R.R. at 95a.

Dr. Hurtubise testified that he has been Gant's doctor since February 2013. He explained that while Dr. Hartman managed Gant's pain, he cares for her other medical issues. He described that he visits Gant at home approximately every three to six months as needed, and that his nurse practitioner Gockley visits weekly to assist with her wound care. Dr. Hurtubise articulated that Gant's medical condition and her thin body place her at an extremely high risk for bedsores which, even under the best circumstances, would be inevitable for her.

---

[20] Gant claims that her left leg has been swollen ever since.

He also expressed that Gant's condition and resulting lower extremity contractures make moving her extremely painful.

Dr. Hurtubise recounted from his two to three home visits before Gant's October 2013 hospitalization that although Gant's bed needed to be updated, her "care seemed to be very reasonable considering her limitations from her parents." R.R. at 98a. He recalled Mother being physically and emotionally attentive to Gant, and diligent with respect to Gant's hygiene and wound care. He asserted that Gant's parents never refused his care advice.

Dr. Hurtubise explained that he now manages Gant's medications and has seen Gant on five occasions since her release, and Gockley visits her every one to two weeks. He described that they oversee her wound care and are working on optimizing her nutrition. He observed Mother reposition Gant, and is aware that Mother provides her medications, maintains her nutrition and contacts him if she has questions. He concluded based upon his observations that Mother "is doing an excellent job." R.R. at 100a. He specifically testified:

> I can't imagine anyone rendering any better care, whether it be a trained nurse or otherwise.
>
> We work really hard with [Mother] to help educate her as to what things she needs to be aware of. She's been very receptive and actually very intelligent and picks these suggestions up very quickly.
>
> So I personally think that the care has been very, very good. And [Gant] . . . has clearly stated that she feels that she's done a good job. I believe that.

R.R. at 100a-101a. However, Dr. Hurtubise described that the differences of opinion between Getgen and Mother regarding Gant's care has created "a very toxic environment for [Mother] who is, I think, truly interested in [Gant's] best

17

interest but felt that there was often an accusatory or a damning kind of tone to the[ir] interactions." R.R. at 100a. He also disagreed with Garman's concerns regarding Mother's care for Gant. In particular, despite not being aware of claims that Gant's medications have been mismanaged, he clarified that since Gant's pain levels may not be constant, medication delivery may not be consistent. He also stated that since Garman is no longer assigned to Gant's case, he has not received any negative reports from Bayada.

Dr. Hurtubise related that although Gant has lived far longer than most sickle cell patients, he suspects that she will succumb to her condition within the next 10 years, probably due to a massive stroke or heart attack related to her blood clotting. When asked whether there is anything other than Gant's general medical condition which places her at imminent risk of death or bodily injury, Dr. Hurtubise responded:

> Sure, related to her medications. . . . [Gant] is on a very complex cocktail of medicines which carry high risk and certainly, again, I think [Mother's] done an incredibly good job of making sure she gets the medications at an appropriate time.
>
> However, it's still -- these are still dangerous medicines, and they can change things . . . in a very short period of time.

R.R. at 101a. Dr. Hurtubise's questioning continued:

> Q. And since your time of overseeing that, have there been any specific concerns that you've seen with respect to medications?
>
> A. You know, I think with just the sheer amount of pain medicines that she requires, it's always a concern for me because these are -- they have a tremendously high street

18

value and the risk would be of somebody breaking into the house and trying to steal them.

However, the Gants have been very diligent with maintaining oversight and awareness of where the medicines are at any given time. We did request at one point with the home health agency and with the POA that a lockbox be given to the patient. Even that wouldn't necessarily deter a theft. You know, it might prevent somebody else from getting into the medicines who doesn't have access.

I can say they've done a great job with the medication that I do not have any concerns.

R.R. at 101a-102a. He informed the trial court that he would like to re-hospitalize Gant for insertion of a subclavian line or port for pain management in order to reduce the amount of high-level medicines Gant must control at home.

Dr. Hurtubise pronounced that since Gant is cognitively able to make decisions regarding her care, "whatever [she] decides for herself is what we should stick with. . . . She's very comfortable in her home environment as expressed several times[;] she feels that the care that's rendered by her family is the best care that she could get." R.R. at 102a. Regarding repositioning, he stated that Gant's pain will dictate its risk versus benefit and that, as long as Gant is of sound mind, she can refuse to be moved even if it is not in her best interests. Dr. Hurtubise related that the services that his office, Bayada and Mother are providing are proper for Gant's health and welfare. He described that Gant's condition is stabilized, and that "she's as good as she's going to be for a while. . . . [I]t will only be a matter of time before she does run into trouble again." R.R. at 109a.

Mother testified that Gant enrolled in DPW's Waiver Program approximately 2½ years before the hearing, under which she and Charlotte Toney

19

were approved as Gant's paid caregivers. She described that, under the Waiver Program, SC Monica Lugo would visit two or three times annually to ensure that Gant was being cared for properly. She stated that she feeds and cleans Gant, repositions her three or four times daily and dispenses her medications.

Mother recounted that Gant's feeding tube has leaked since 2010, but got worse in the fall of 2013. She explained that when gauze packing did not work, Gant was no longer effectively being fed, hydrated or medicated, thus resulting in her October 2013 hospitalization. She stated that while they awaited the arrival of a new feeding tube part, Gant's condition worsened.[21] She recalled that when Gant became abnormally dehydrated, she called an ambulance. Mother specifically disputed that Gant had 11 sores when she was admitted to LRMC, since the staff counted the holes drilled into her bones for peripherally-inserted central catheter (PICC) lines.[22] She testified that in the days leading up to the DPW report, LRMC staff had the same feeding tube difficulties, whereby liquids escaped and pooled around Gant's legs causing additional pressure wounds. Although she acknowledged that LRMC experienced difficulties inserting a PICC line, she did not believe that Gant was transferred to Hershey Medical Center for that reason, but rather on Getgen's order.

Mother declared that, although there have been several people involved with Gant's care since she was released from the hospital in February 2014, she still provides the same care she always has. She related feeling

---

[21] Notably, the August 12, 2013 SC notes reflect that although Gant's bed was padded, Mother and Father had requested pressure pads to make Gant more comfortable. *See* S.R.R. at 29b.

[22] PICC lines are used to deliver antibiotics, nutritional supplements and fluids into the body.

20

uncomfortable when Garman came to care for Gant, since it did not appear that Garman knew how to provide wound care until Gockley showed her, and because she seemed to be investigating rather than providing medical care. Mother stated that Garman was rough with Gant and, when she asked Garman to take her time, Garman responded that she had only 45 minutes for each patient. She related that Gant eventually asked that Garman be replaced. Mother explained that after the February 26th meeting, she invited Garman into the bathroom to be sure there were no hard feelings about her being replaced. She also disputed that Garman raised medication issues with her.

Mother described that when she met Getgen at LRMC on October 24, 2013, Getgen discussed services necessary to help Gant at home. Other than Getgen's order to move Gant to Hershey Medical Center, she had little interaction with Getgen. Mother stated that Getgen never visited Gant after she returned home, but Mother and Rogers attended the February 26th meeting to discuss Gant's care plan. She testified that although she was present when Gant made her medical service decisions, she did not interfere with those decisions.

Father testified that he and Mother were Gant's primary caregivers since birth, and they continued to care for her under the Waiver Program until a guardian was appointed. He recalled that once Gant qualified for the Waiver Program, SCs would visit and assess Gant every six months. Otherwise, his interactions on Gant's behalf were as her POA. He claimed that he has never interfered with Gant's ability to obtain care and, in fact, returned every one of Getgen's calls to be sure he knew what her next move would be. He described that when Getgen asserted they did not return telephone calls was at the time when Gant was in the hospital, and the time when no one answered the door for Garman

21

was because she was at the wrong address. He also recalled Garman's demeanor changing after Gant complained that Garman was rough with her.

Getgen testified for DPW in rebuttal that Gant's testimony notwithstanding, she did not order Gant to undergo the painful CAT scan, but explained to Gant why the physician ordered it. She also explained that she did not reduce the family's visiting hours, but rather Hershey Medical Center imposed the restrictions due to the family's abuse thereof. Getgen described the family's treatment of her as aggressive, threatening, difficult and accusatory, and that such behavior upset Gant who then also became aggressive.[23] She explained that although her sickle cell patients are often hospitalized and have pressure wounds, she has never witnessed the type of deterioration Gant displayed in October 2013. Getgen related that she was particularly concerned when Mother told her she did not reposition Gant when it was too painful for her. Getgen witnessed Mother refuse medical treatment on Gant's behalf, and there is history of similar behavior in DPW's records as far back as May 2013. *See* S.R.R. at 26b-34b. Getgen related:

> Under protective service law, we offer a care plan to mitigate or eliminate risk and so part of that would be to look at what care is provided and to try to develop a plan that would adequately meet their needs. If . . . you're unable under the waiver to ensure someone's health and welfare, we can terminate the waiver. So that's one option.

R.R. at 132a. Based upon her investigations and observations, Getgen attributed Gant's lack of success in the Waiver Program to Mother's inability to meet Gant's

---

[23] In light of the difficulties and Dr. Hurtubise's oversight, Getgen specifically asked that the trial court terminate her responsibility for Gant's medical care decisions. *See* R.R. at 133a.

22

needs. Getgen concluded that even if Gant is reinstated to the Waiver Program under the Agency-Directed Model, Mother should not be Gant's paid caregiver.

In light of the foregoing evidence, on July 8, 2014, the trial court granted DPW's Petition, "find[ing] that [] Gant is a medically[-]compromised adult in need of protective services as defined under the [Act]," and granted the following relief:

> (1) [] Gant's autonomy with respect to medical treatment shall be preserved.
> (2) [Medical Assistance] services shall be available for [Gant] as long as she is eligible for those services, except for Consumer-Directed Services through the Commonwealth's Home and Community-Based Services Programs. This Order should not be construed to limit any other rights [] Gant may have under the [Medical Assistance] Program.
> (3) All prescription medications for [] Gant shall be coordinated by [] Gant's primary care physician.
> (4) No person shall interfere with the provision of services to [] Gant or her right to consent to the provision of services.
> (5) The Order that appoints [] Getgen as agent with the authority to select and to consent to medical treatment, which is dated December 13, 2013, is vacated.

R.R. at 54a-55a. Gant appealed to this Court.[24]

---

[24] On August 5, 2014, Gant filed her appeal with the Superior Court. On September 17, 2014, the Superior Court transferred the appeal to this Court.

An intermediate appellate court shall "review an order disposing of a petition for special relief under an abuse of discretion standard of review." *Kulp v. Kulp*, 920 A.2d 867, 870 (Pa. Super. 2007). The Act appears to have been modeled after the Older Adults Protective Services Act, Act of July 1, 1988, P.L. 381, *as amended,* 35 P.S. §§ 10225.101–10225.5102, applicable to persons age 60 and over. Our research has disclosed only one case involving this Court's standard of review exclusively under the Older Adults Protective Services Act. Therein, this Court applied an abuse of discretion standard. *See In the Interest of M.B.*, 686 A.2d 877 (Pa. Cmwlth. 1996). "[T]his Court has found an abuse of discretion where a [fact finder] ignored 'substantial, uncontradicted evidence in the record, and the strong inferences drawn from it . . .

### 1. <u>Adult in Need of Protective Services</u>

Gant argues that the trial court erred in finding that she was an adult in need of protective services under the Act. Specifically, Gant contends that clear and convincing evidence did not support the trial court's conclusion that she required involuntary protective services.

The General Assembly declared the Commonwealth's policy in Section 102 of the Act:

> (1) Adults who lack the capacity to protect themselves and are at imminent risk of abuse, neglect, exploitation or abandonment must have access to services necessary to protect their health, safety and welfare.

> (2) **Adults have the right to make choices**, subject to the laws and regulations of this Commonwealth, regarding their lifestyles, relationships, bodies and health, **even when those choices present risks to themselves** or their property.

> (3) **Adults have the right to refuse some or all protective services**.

> (4) Information about protective services should be provided in a safe place and in a safe, understandable and responsive manner.

> (5) **The Commonwealth must provide for the** detection, prevention, reduction and **elimination of abuse, neglect, exploitation and abandonment** and establish a program of protective services **for adults in need of them**.

---

.'" *Philly Int'l Bar, Inc. v. Pa. Liquor Control Bd.*, 973 A.2d 1, 3 (Pa. Cmwlth. 2008) (quoting *Pa. Dep't of Transp. v. Mazzarini*, 919 A.2d 295, 302 (Pa. Cmwlth. 2007)).

(6) Adults have the right to receive services in the most integrated settings and in the manner least restrictive of individual liberties.

35 P.S. § 10210.102 (emphasis added).

Section 304(b)(1) of the Act, 35 P.S. § 10210.304(b)(1), specifies that protective services shall be provided **only with the adult's consent**, unless otherwise ordered by a court or provided under Section 307 of the Act. Section 307(a)(1) of the Act, provides: "Where there is **clear and convincing evidence** that, if protective services are not provided, the adult is at imminent risk of death, serious injury[25] or serious bodily injury,[26] the agency may petition the court for an emergency order to provide the necessary services." 35 P.S. § 10210.307(a)(1) (emphasis added). The clear and convincing "standard of evidence requires evidence so 'clear, direct, weighty, and convincing as to enable either a judge or jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'"[27] *In re S.H.*, 96 A.3d 448, 454 n.7 (Pa. Cmwlth. 2014) (quoting *Suber v. Pa. Comm'n on Crime & Delinquency,* 885 A.2d 678, 682 (Pa. Cmwlth. 2005)).

---

[25] "Serious injury" is defined in Section 103 of the Act as "[a]n injury that: (1) causes a person severe pain; or (2) significantly impairs a person's physical or mental functioning, either temporarily or permanently." 35 P.S. § 10210.103.

[26] "Serious bodily injury" is defined in Section 103 of the Act as "[i]njury that: (1) creates a substantial risk of death; or (2) causes serious permanent disfigurement or protracted loss or impairment of the function of a body member or organ." 35 P.S. § 10210.103.

[27] Cases involving a significant loss of freedom or livelihood generally require clear and convincing evidence. *See In the Matter of Lawrence D. Greenberg*, 749 A.2d 434 (Pa. 2000) (professional license reinstatement proceedings); *In re: B., N.M.*, 856 A.2d 847 (Pa. Super. 2004) and *In re Interest of B.L.L.*, 787 A.2d 1007 (Pa. Super. 2001) (parental rights termination/dependency proceedings); *In re S.B.*, 777 A.2d 454 (Pa. Super. 2000) (involuntary commitment proceedings).

The Act does not define "imminent risk."[28] Section 1903(a) of the Statutory Construction Act of 1972 provides that when words in a statute are undefined, they must be accorded "their common and approved usage[.]" 1 Pa.C.S. § 1903(a). "Where a court needs to define an undefined term, it may consult definitions in statutes, regulations or the dictionary for guidance, although such definitions are not controlling." *Adams Outdoor Adver., LP v. Zoning Hearing Bd. of Smithfield Twp.*, 909 A.2d 469, 483 (Pa. Cmwlth. 2006). *Merriam-Webster's Collegiate Dictionary* (11th ed. 2004) defines "**imminent**" as "to **project, threaten**, . . . : **ready to take place**; *esp*: hanging threateningly over one's head . . . ." *Id.* at 621 (emphasis added).[29] "**Risk**" is defined as the "**possibility of loss or injury [or]** PERIL[;] . . . someone or something that creates or suggests a hazard[.]" *Id.* at 1076 (emphasis added).

## A. October 26, 2013 Emergency Guardianship Order[30]

Section 304(b)(2) of the Act, 35 P.S. § 10210.304(b)(2), specifies that nothing in the Act will prevent DPW from seeking guardianship under the Probate, Estates and Fiduciaries Code (Code).[31] Section 5511(a) of the Code authorizes the trial court to appoint a guardian for incapacitated persons upon petition and a

---

[28] Despite being long-established and similar in language and purpose, the Older Adults Protective Services Act similarly fails to define "imminent risk." *See Donaldson v. Butler Cnty.*, 118 A.3d 1253 (Pa. Cmwlth. 2015).

[29] "Immediate," on the other hand, is defined as "acting or being without the intervention of another object, cause, or agency[;] . . . occurring, acting or accomplished without loss or interval of time . . . ." *Merriam-Webster's Collegiate Dictionary* at 620.

[30] Although this order is not directly at issue in this case, Gant raises it in her argument and, because the circumstances of the emergency guardianship were incorporated in the Petition and were relied upon by the parties and the trial court, we will likewise discuss it.

[31] 20 Pa.C.S. §§ 5501-5555.

hearing and "upon the presentation of **clear and convincing evidence**."    20 Pa.C.S. § 5511(a) (emphasis added).    Section 5511(e) of the Code requires that, in addition to the incapacitated person's name, age and address, and the names and addresses of other relevant parties, an emergency guardianship petition shall contain

> the **reasons why** guardianship is sought, a description of the functional **limitations** and physical and mental condition of the alleged incapacitated person, the **steps taken to find less restrictive alternatives**, the specific **areas of incapacity** over which it is requested that the guardian be assigned powers . . . .

20 Pa.C.S. § 5511(e) (emphasis added).    Section 5513 of the Code authorizes the trial court to grant emergency guardianships if there is **clear and convincing evidence** that "failure to make such appointment will result in irreparable harm to . . . the alleged incapacitated person."[32]  20 Pa.C.S. § 5513.  Moreover,

> [t]he appointment of a guardian lies within the discretion of the trial court and will be overturned only upon an abuse of discretion.  *Estate of Haertsch, . . .* 649 A.2d 719, 720 ([Pa. Super.] 1994).    'Discretion must be exercised on the foundation of reason.    An abuse of discretion exists when the trial court has rendered a

---

[32] We acknowledge that Section 5513 of the Code under which the emergency guardianship petition was filed requires clear and convincing evidence of "irreparable harm." 20 Pa.C.S. § 5513. *Black's Law Dictionary* defines "irreparable injury" as "[a]n injury that cannot be adequately measured or compensated by money and is therefore often considered remediable by injunction." *Id.* at 856. Because "imminent" refers to timing, and "irreparable" is a matter of degree, these terms are not mutually exclusive and, therefore, use of the term "irreparable" in Section 5513 of the Code does not in any way modify the requirements under the Act.

An emergency guardianship obtained under Section 5513 of the Code is effective for up to 72 hours. 20 Pa.C.S. § 5513. An emergency order may extend the guardianship for up to 20 days thereafter. *Id.* A full hearing must be conducted for an emergency guardianship to continue after the emergency order expires. *Id.*

judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will.' *Harman . . . v. Borah,* . . . 756 A.2d 1116, 1123 ([Pa.] 2000) (citations and quotations omitted).

*In re Duran*, 769 A.2d 497, 506 (Pa. Super. 2001).

Here, based upon LRMC's report, Getgen investigated Gant's circumstances at DPW's request and deemed them sufficient to warrant emergency intervention as of October 26, 2013. There is nothing in the Act or case law that prohibited the trial court from making its assessment based solely on the Guardianship Petition.[33] No one disputes that when the Orphan's Court entered its October 26, 2013 order, Gant was incapable of making medical decisions, and that her parents refused LRMC's medical advice that she be immediately transferred to Hershey Medical Center for life-saving treatment. Accordingly, on October 26, 2013, the Orphan's Court properly determined that Gant was an adult in need of protective services.

## B. <u>December 13, 2013 Protective Services Order</u>

DPW had the burden of proving with clear and convincing evidence that, without protective services, Gant was "at imminent risk of death, serious injury or serious bodily injury[.]" 35 P.S. § 10210.307(a)(1). "Protective services" are defined in Section 103 of the Act as "[t]hose activities, resources and supports

---

[33]    [T]he judge was required to make his decision in an extremely short period of time. Under the circumstances the failure to conduct a fuller hearing and/or to elicit testimony from the witnesses . . . cannot be a basis for a finding of error. Under the statute, the judge was required to hold a hearing consistent with what was feasible in the circumstances, and we believe he fulfilled that obligation.

*In re Estate of Dorone*, 534 A.2d 452, 455 (Pa. 1987) (quotation marks and footnote omitted).

provided to adults under this [A]ct to detect, prevent, reduce or eliminate abuse, neglect, exploitation and abandonment."[34]   35 P.S. § 10210.103.   "Adult" is defined as "[a] resident of this Commonwealth between 18 and 59 years of age who has a physical or mental impairment that substantially limits one or more major life activities."  *Id.*  "Adult in need of protective services[]" is defined as "[a]n adult **who needs the assistance of another person to obtain protective services** in order to prevent imminent risk to person or property."  *Id.* (emphasis added).

Gant's capacity had changed by the time DPW filed the Petition.  At that time, Gant had been in rehabilitation at Select Specialty Hospital for nearly a month.  The Guardianship Petition, the Orphan's Court's October 26, 2013 order and Dr. Howse's report were appended to the Petition.  The Petition which contained the following averments:

> 8. [Gant's] parents continued to be challenging throughout [Gant's] hospitalizations, despite the fact, due to the medical decisions made by [] Getgen, [Gant] has stabilized and has regained capacity.
>
> 9. [Gant's] capacity was evaluated by Dr. [] Howse on November 21, 2013 and the results were published to [DPW] and Counsel on December 5, 2013 and then forwarded to Counsel for [Gant] and Counsel for the Gant family. . . .
>
> 10. Of grave concern to [DPW is] the quality of care administered to [Gant], in the home setting, which almost cost her life.  [Gant's] parents are not providing the level and quality of care required to sustain the waiver program in the home.  [Gant's] parents have a history of

---

[34] The Act's definition is identical to the "protective services" definition in Section 103 of the Older Adults Protective Services Act.  *See* 35 P.S. § 10225.103.

rejecting the services provided in their home and rejecting the medical professionals that make recommendations to them. A continuation of this behavior will result in the removal of waiver services.

11. [Gant] has had a history of hospital admissions as a result of multiple stage four skin wounds, severe infection of the blood, severe dehydration and malnutrition. [Gant's] parents tend to blame medical personnel for physical problems suffered by [Gant].

12. [Gant] suffers from severe sickle cell anemia, seizure disorder, contractures, multiple decubitus ulcers, chronic and extreme physical pain that is currently being managed with narcotic medications and receives nutrition through a feeding tube.

13. **Pursuant to . . . Section 307(a)(1) [of the Act,] Section 307 - Involuntary intervention by emergency court order, a Court can enter an emergency order to provide necessary services where there is clear and convincing evidence that, if protective services are not provided, the adult is at imminent risk of death, serious injury or serious bodily injury.**

14. Because [Gant] has capacity, has made it clear, to [] Getgen and [DPW], she intends to return to the home where she has chronically received substandard care, and will not agree to the level of services required to sustain her life, it is essential that the Court permit [DPW] to continue managing [Gant's] health care.

15. Because [Gant] has capacity, the guardianship action must be withdrawn as [DPW] cannot sustain [its] burden to establish the requisite lack of capacity to have a plenary guardian appointed for [Gant].

16. Medical records for [Gant] document the poor condition she is in at the time of each hospital admission, including stage four sores that cause pain. Pain causes the need for pain medication. Pain medication causes the

30

need for monitoring and a way to administer pain medication which cannot be done through traditional methods due to the severity of [Gant's] current disease process. The record is replete with examples of [Gant's] mother and paid caregiver not performing in a manner that is required to sustain [Gant's] life and the funding of the waiver program. It is well documented, in every hospital setting, [Gant's] mother and often her father interfere with treatment.

17. **Without the involvement of the Court, under the . . . Act['s] emergency intervention procedures, [Gant] will return home and not have the skilled care she needs and this time she may not survive. The Act does not require a lack of capacity for the Court to enter an emergency order for services, but only requires a showing, by clear and convincing evidence, but for the involvement of the Court, [Gant] is at imminent risk of death, serious injury or serious bodily injury.**

R.R. at 6a-8a (emphasis added).

Dr. Howse's report stated, in relevant part:

[Gant's] thinking about her disease, treatments and prognosis was about as medically accurate as most lay persons understanding of their acute and chronic illnesses. Her goals are for comfort care, punctuated with all the acute care necessary to return to living at home, but not enough to be more functional if it costs more pain or work. Her expectation of personal recovery is low, even though her dream of it is high. Her personal agency for achieving any further function is low, and cannot be improved.

She has chosen her present course of action. Her reasoning about it is consistent and intact, repetitive and historic. Understanding of her medical situation is intact, based on fact and intact memory with logical relationships of facts and cause and effect. She is not

31

entirely trusting of doctors, and less trusting when her personal goals are not achieved by their proposed regimens. The insistence of her medical professionals that she improve her function and cooperate with rehabilitative care will always be met with resistance. She has no interest in this. Her appreciation of her ongoing morbidity does not match the appreciation of her physicians, but nonetheless is consistent, repetitive, goal[-]oriented and based in fact as she understands it. She wants to return to her home for her family to care for her, and have whatever acute interventions she must as time goes forward. She is not interested in hospice[-]based care for this very reason, even though this would be the best way for her to have the right dose of opioid medication supplied without interruption.

**[] Gant can direct her medical decision[-]making.** She can choose between disparate potential courses of action. She can understand her medical diagnoses and treatment options. She can reliably participate in informed consent for medical procedures and decision[-]making. She can appreciate the consequences of these diagnoses and treatments or their refusal. She can demonstrate intact reasoning with which to apply her long[-]term personal goals and values to these choices. She should have a power of attorney for these decisions because of her physical debility and her expected ongoing episodes of acute illness which are likely to cause temporary decision[-]making incapacity.

R.R. at 33a-34a.

The Petition and Dr. Howse's report put the trial court on notice that Gant had regained her capacity and was again fully capable of making her medical decisions. The Petition did not allege that Gant was in imminent risk of serious injury or death while she was indefinitely hospitalized, but rather **speculated** that if and when she returned home without skilled care, she **may** face such risk. *See* Petition ¶ 17 and Getgen's testimony at R.R. at 68a-69a. Speculation is not

evidence that is "so 'direct, weighty, and convincing as to enable . . . a judge . . . to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'" *S.H.*, 96 A.3d at 454 n.7 (quoting *Suber,* 885 A.2d at 682). Thus, when the trial court issued its December 13, 2013 order pursuant to Section 307(a) of the Act, there was not clear and convincing evidence that without protective services Gant was "at imminent risk of death, serious injury or serious bodily injury." 35 P.S. § 10210.307(a)(1). Accordingly, we hold that Gant was not an adult in need of protective services on December 13, 2013, when the trial court authorized Getgen to make Gant's medical decisions pending a hearing on the Petition.

### C. July 8, 2014 Protective Services Order

Thereafter, at the hearings, DPW acknowledged that it had withdrawn the Guardianship Petition because Gant regained her capacity during her hospitalization.[35] However, the fact that Gant regained her capacity does not alter the possibility that Gant may be an adult in need of protective services. Although Section 102(1) of the Act expressly requires that adults who are incapacitated and are at imminent risk "must **have access to services** necessary to protect their health, safety and welfare[,]" there is no requirement in the Act that incapacity precede protective services. 35 P.S. § 10210.102(1) (emphasis added). Further, neither the definitions of "adult," "adult in need of protective services," and "protective services," nor applicable Sections 102(2) (relating to legislative purpose and choice), 304 (relating to provision of services), 307 (relating to involuntary intervention), 308 (relating to rights of protective services clients) of

---

[35] Accordingly, Getgen also asked the trial court to remove her as Gant's Act 70 decision-maker.

33

the Act require that the adult be incapacitated. In fact, Section 304(b) of the Act, 35 P.S. § 10210.304(b), specifies that protective services shall be provided only with the adult's consent, unless otherwise ordered by a court or provided under Section 307 of the Act. Therefore, it is clear that the General Assembly intended for protective services to be available even to capable persons.

DPW bore the burden of proving with clear and convincing evidence that, without protective services, Gant was "at imminent risk of death, serious injury or serious bodily injury." 35 P.S. § 10210.307(a)(1). DPW witnesses confirmed that Waiver Services were terminated on or about December 20, 2013, and that Gant's condition had not deteriorated since her return home. We acknowledge that at that time and during the pendency of the hearings, her care was being closely overseen by Getgen, Bayada nurse's aides, nurses and her physician and, therefore, the care she was receiving did not place her at any greater risk than her terminal condition itself. We also recognize that Gant's "goals are for comfort care, punctuated with all the acute care necessary to return to living at home, but not enough to be more functional if it costs more pain or work." R.R. at 33a. Gant has further made it clear that she would choose Mother's care over that provided by anyone else, even though that decision may have led to her October 2013 hospitalization.

However, in addition to Section 102 of the Act, in Section 401(a) of the Public Welfare Code, which was intended to guide DPW's actions, the General Assembly declared that its intent is "to promote the self-sufficiency of all the people of the Commonwealth." 62 P.S. § 401(a). Moreover,

> [t]he right to refuse medical treatment is deeply rooted in our common law. This right to bodily integrity was recognized by the United States Supreme Court over a century ago when it proclaimed 'no right is held more

34

sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person. . . .' *Union Pac*[]. *R*[*y.*] *Co. v. Botsford,* 141 U.S. 250, 251 . . . (1891).

*Duran*, 769 A.2d at 503.[36]  Our Supreme Court held:

> This right, however, is not absolute.  The right of the patient to abstain from medical treatment must be balanced against interests of the state.  The four state interests most commonly recognized by the courts are: 1) protection of third parties; 2) prevention of suicide; 3) protection of the ethical integrity of the medical community; and 4) preservation of life.

*In re Fiori*, 673 A.2d 905, 910 (Pa. 1996).[37]  The *Fiori* Court stated: "Of these four interests, [the state's interest in preserving life] is the most significant.  It

---

[36] Although *Duran* is distinguishable from the instant case, the court's explanation regarding the state's interests, and the Commonwealth citizen's right to decline medical care are nevertheless applicable.

[37] The state's primary focus in protecting third parties is on whether the individual has dependents and, since Gant has none, that state interest is not applicable here.  *See Fiori.*  Further, because there are no claims implicating the Commonwealth's interest in compromise of the medical community's ethical integrity, those interests are not applicable in this case.  *Id.*

The Pennsylvania Superior Court explained:

> When evaluating the state's interest in protecting third parties, 'the primary focus is on whether the patient has dependents who would be left emotionally and financially bereft were the patient to refuse medical treatment.' *Fiori,* [673 A.2d] at 910.  When evaluating the state's interest in protecting the ethical integrity of the medical profession, courts should recognize that it is well within the parameters of medical ethics to abide by a patient's direction to abstain from treatment under certain circumstances. *Wons* [*v. Pub. Health Trust of Dade Cnty.*, 500 So.2d 679,] 686 [(Fla. App. 3 Dist. 1987)].  'Medical ethics do not require medical intervention in disease at all costs.' [*In the Matter of*] *Conroy*, [486 A.2d 1209,] 1224 [(N.J. 1985)].  'It is not necessary to deny a right of self-determination to a patient in order to recognize the interests of doctors, hospitals, and medical personnel in attendance on the

35

encompasses the separate, but related, concerns of preserving the life of the particular individual and also safeguarding the sanctity of all life." *Id.* at 910 (citations omitted).[38] The Pennsylvania Superior Court held:

> When examining the state's interest in preserving the lives of its citizens, an important distinction must be drawn between protecting the state's citizens from injuries by a third party and protecting citizens from themselves. *See Fosmire* [*v. Nicoleau*, 555 N.E.2d 77,] 81 [(N.Y. 1990)]. While **the state** has a substantial interest in protecting its citizens from each other, **its interest is relatively low when the acts of one individual do not injure others or impact the public at large**. *Id.* 'This is consistent with the primary function of the state to preserve and promote liberty and the personal autonomy of the individual.' *Id.* at 82. Finally, while the state's interest in preventing suicide is a natural corollary to its interest in preserving life, it is generally considered as a distinct state interest for purposes of balancing the state's interests with the rights of an individual to refuse medical treatment. *See* [*In the Matter of*] *Conroy*, [486 A.2d 1209,] 1224 [(N.J. 1985)]. Nevertheless,
>
>> declining life-sustaining medical treatment may not properly be viewed as an attempt to commit suicide. **Refusing medical intervention merely allows the disease to take its natural course**; if

---

patient.' *Superintendent of Belchertown State Sch*[.] *v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417, 426–427 (1977). **'Indeed, if the patient's right to informed consent is to have any meaning at all, it must be accorded respect even when it conflicts with the advice of the doctor or the values of the medical profession as a whole.'** *Conroy*, [486 A.2d] at 1225.

*Duran*, 769 A.2d at 503-04 (emphasis added).

[38] The *Fiori* Court concluded that even "a [persistent vegetative state (PVS)] patient's right to self-determination outweighs any interests the state may have in maintaining life[-]sustaining treatment for the patient[.]" *Fiori*, 673 A.2d at 910.

36

> death were eventually to occur, it would be the result, primarily, of the underlying disease, and not the result of a self-inflicted injury. In addition, **people who refuse life sustaining medical treatment may not harbor a specific intent to die, rather, they may fervently wish to live, but to do so free from unwanted medical technology[.]**
>
> *Id.* (internal citations omitted). "**On balance, the right to self-determination ordinarily outweighs any countervailing state interests, and competent persons generally are permitted to refuse medical treatment, even at the risk of death.**" *Id.* at 1225.

*Duran*, 769 A.2d at 504 (emphasis added).

No one disputes that Gant has a debilitating, terminal illness that places her in perpetual peril of malnourishment, dehydration and severe pressure wounds, resulting in her need for medical assistance and heavy narcotics. All parties agree that even if Gant is monitored by DPW and receives the best medical care available, there is no guarantee that she will not again be hospitalized near death.[39] The parties also agree that institutionalization is not in Gant's best interests and, for various reasons, in-home care is best for her.

The record further reflects that although Mother may occasionally attempt to direct Gant's care, it is only with Gant's best interests at heart. We are not convinced that Mother interferes with Gant's care, but rather expresses differences of opinion. With the exception of Mother's choice not to have Gant transferred to Hershey Medical Center in October 2013, the circumstances of which are not clear here, there is nothing in this record proving that Gant's choice of her Mother's care is harmful, or not in Gant's best interests. Mother's

---

[39] At argument, both counsel confirmed that Gant has been hospitalized several times since the trial court's order was issued.

interactions with Gant's care providers appear to have been to reinforce Gant's wishes, and to be sure that Gant's needs were handled with the same care Mother would provide. Moreover, several months before Gant's October 2013 hospitalization for infection and severe pressure wounds, Mother and Father had requested pads for her bed to prevent such wounds and make Gant more comfortable. *See* S.R.R. at 29b. DPW did not provide a special mattress for that purpose until February 2014. Thus, even with DPW's oversight, Gant's physical condition will continue to decline. Accordingly, DPW has failed to prove by clear and convincing evidence that, **without protective services**, Gant was "at imminent risk of death, serious injury or serious bodily injury." 35 P.S. § 10210.307(a)(1). The trial court was presented with a competent adult who desires services provided by people who know and love her. She also wishes to determine when and under what circumstances she will accept recommended and preventative care. This is clearly her right.

Further, in its July 2014 order, the trial court stated: "The Court further finds that protective services are necessary to protect and maintain [Gant's] fragile health, safety and welfare." R.R. at 55a. However, "[**p**]**rotective services**[]" are defined in Section 103 of the Act as "[t]hose activities, resources and supports provided to adults under this [A]ct **to detect, prevent, reduce or eliminate abuse, neglect, exploitation and abandonment.**" 35 P.S. § 10210.103 (emphasis added). The order did not contain a finding by the trial court that Mother or anyone else "abuse[d], neglect[ed], exploit[ed or] abandon[ed]" Gant. *Id.* Therefore, there is no basis on which the trial court could have concluded that Gant was an adult in need of protective services.

In addition, with the exception of Paragraph (2), the trial court's July 8, 2014 order preserves Gant's autonomy regarding her medical treatment and continues her doctor's coordination of her medical treatment. *See* R.R. at 54a-55a. The trial court's order carefully guards Gant's choice to remain at home and to make her medical decisions with "only such services as are necessary to remove the conditions creating [her] established need," 35 P.S. § 10210.103(b), provided "in the manner least restrictive of [her] individual liberties." 35 P.S. § 10210.102(6). Under the circumstances, we fail to see what protective services remain necessary.[40] Without clear and convincing evidence to the contrary, we

---

[40] DPW has not promulgated regulations under the Act. According to Section 15.91(a) of DPW's Regulations under the Older Adults Protective Services Act,

[p]rotective services activities include the following:

  (1) Administering protective services plans.

  (2) Receiving and maintaining records of reports of abuse.

  (3) Conducting investigations of reported abuse.

  (4) Conducting assessments and developing service plans.

  (5) Petitioning the court.

  (6) Providing emergency involuntary intervention.

  (7) Arranging for available services needed to fulfill service plans[.]

  (8) Purchasing, on a temporary basis, . . . services determined by a service plan to be necessary to reduce, correct or eliminate abuse, neglect, exploitation or abandonment of an older adult when the services are not available within the existing resources of the agency or other appropriate provider.

6 Pa. Code § 15.91(a).

hold that the trial court erred by declaring Gant an adult in need of protective services. Therefore, that portion of the trial court's order is reversed.

### 2. Waiver Program Service Eligibility

Gant also argues that the trial court erred in Paragraph (2) of its order by restricting her eligibility for DPW's Medical Assistance benefits. "Section 403[(b)] of the Public Welfare Code, . . . 62 P.S. [§] 403(b)] requires DPW to promulgate regulations as to eligibility for, and the nature and extent of, public assistance. DPW having done so, its regulations have the force and effect of law." *Brog v. Dep't of Pub. Welfare*, 401 A.2d 613, 615-16 (Pa. Cmwlth. 1979). Section 308(a)(3) of the Act directs that "[a]n appeal of a denial of services by [DPW] . . . shall be conducted according to the provisions of the rules and regulations issued by [DPW] under . . . the Public Welfare Code." 35 P.S. § 10210.308(a)(3). DPW's Regulations permit participants released from its Waiver Program to appeal from DPW's action. *See* 55 Pa. Code § 275.1(a)(2), (4); *see also Bussoletti v. Dep't of Pub. Welfare*, 59 A.3d 682 (Pa. Cmwlth. 2012); *Chambers v. Dep't of Pub. Welfare*, 19 A.3d 1 (Pa. Cmwlth. 2011).

---

Arguably, if these same protective services were applicable under the Act, or if regulations are promulgated that are in line with the above provisions, even in the absence of an order declaring Gant in need of such services, DPW would nevertheless be obligated to Gant to accept and investigate abuse reports, petition the court and seek emergency involuntary intervention and provide services as necessary as listed above. *See* Sections 102 (stating the Commonwealth's policy to provide adults with access to necessary services), 103 (defining adult in need of protective services and protective services), 302 (requiring reporting), 303 (requiring report investigations), 304 (requiring adult consent for protective services), 307 (relating to emergency intervention by court order) of the Act. 35 P.S. §§ 10210.102, .103, .302, .303, .304, .307.

40

Section 275.1(b) of DPW's Regulations specify, in pertinent part:

The objectives of appeals and fair hearing will be as follows:

(1) **To afford applicants and recipients an opportunity for an impartial, objective review of decisions, actions and delays, or in actions made by** County Assistance Offices and [**DPW**].

(2) To settle the issue or issues raised by the client in requesting a hearing and to produce a **clear and definitive decision setting forth the findings of** [**DPW**].

(3) To **contribute to uniformity** in the application of [DPW's] regulations.

(4) To **reveal aspects of [DPW's] regulations that are deficient, inequitable, or constitute a misconstruction of law**.

55 Pa. Code § 275.1(b) (emphasis added). Section 275.4 of DPW's Regulations requires that DPW's Bureau of Hearings and Appeals (BHA) hold a hearing before a hearing officer. 55 Pa. Code § 275.4. Section 275.3(a) of DPW's Regulations grants appellants the right to appear at the hearing and present evidence. 55 Pa. Code § 275.3(a). BHA's Director will issue a written decision that may be appealed to DPW's Secretary and, thereafter, to this Court. 55 Pa. Code § 275.4(h)(4); *see also Chambers*.

In the instant case, the parties stated that DPW terminated Gant from its Waiver Program and that Gant appealed from that decision. Neither DPW's termination notice, nor Gant's appeal therefrom are contained in this record, and there was no record evidence offered regarding that process. At argument, counsel

informed this Court that a hearing had been held, and that BHA's decision was stayed pending the outcome of this appeal.

DPW's Regulations do not authorize the trial court to decide whether and under what circumstances Gant is entitled to Medical Assistance.[41] Even this Court's review cannot occur until DPW's final decision has been issued and an appeal filed therefrom. The Pennsylvania Supreme Court has held:

> When the Legislature has seen fit to enact a pervasive regulatory scheme and to establish a governmental agency possessing expertise and broad regulatory and remedial powers to administer that statutory scheme, a court should be reluctant to interfere in those matters and disputes which were intended by the Legislature to be considered, at least initially, by the administrative agency. Full utilization of the expertise derived from the development of various administrative bodies would be frustrated by indiscriminate judicial intrusions into matters within the various agencies' respective domains.

*Feingold v. Bell of Pa.*, 383 A.2d 791, 793 (Pa. 1977). Thus, neither the trial court nor this Court has jurisdiction to decide Gant's eligibility for the Waiver Program until Gant has exhausted her administrative remedies.[42] Accordingly, the trial court lacked jurisdiction to restrict Gant's eligibility for DPW's Medical

---

[41] The fact that the trial court permitted Gant to participate in the Waiver Program under an Agency-Directed Model does not change the fact that the trial court was not authorized to determine Gant's Medical Assistance and/or Waiver Program eligibility.

[42] We acknowledge that we lack jurisdiction to decide whether Gant is generally eligible for Medical Assistance benefits, or specifically whether, thereunder, Gant should continue in DPW's Waiver Program under an Agency-Directed or Consumer-Directed Model. However, considering the compelling facts and argument presented in this case, the important benefits provided to Gant by DPW's Waiver Program to date, and recognizing the Mother's critical role in Gant's daily care, the record evidence strongly suggests that Gant should remain in DPW's Waiver Program with Mother as her DPW-paid caregiver.

42

Assistance benefits, and erred by doing so. Thus, Paragraph (2) of the trial court's order is vacated.

### 3. **Injunction Notice Sufficiency**

Gant next argues that she was not afforded sufficient notice that DPW sought to enjoin Mother's alleged interference with Gant's ability to consent to protective services. We acknowledge that Section 304(c) of the Act provides that "[i]f any person interferes with the provision of services or the right of an adult to consent to provision of services, [DPW] may petition the court for an order enjoining the interference."[43] 35 P.S § 10210.304(c). Although the Petition repeatedly averred that Gant's parents interfered with her care, its prayer for relief sought only "an [o]rder permitting [DPW] to continue to direct [Gant's] health care pending a hearing." R.R. at 8a. In addition, the Petition did not refer to Section 304(c) of the Act or seek an order enjoining Mother's alleged interference. Moreover, the following exchange during the June 16, 2014 hearing reflects that the parties and the Court were unclear as to whether the Petition encompassed Section 304(c) of the Act:

> [Gant's Counsel] MR. ROTHERMEL: . . . [T]here's no [Section] 304 in the petition.
>
> [DPW's Counsel] MS. CHEUVRONT: We are operating under Act 70 of which [Section] 304 is a component of

---

[43] Section 304(c) of the Older Adults Protective Services Act similarly provides: "If any person interferes with the provision of services or interferes with the right of an older adult to consent to provision of services, the agency may petition the court for an order enjoining such interference." 35 P.S § 10225.304(c); *see also* 6 Pa. Code § 15.91(e). Our research has disclosed no cases where an injunction has been sought under either the Act or the Older Adults Protective Services Act.

Act 70 and doesn't in any way construe the law the way you have chosen to.

MR. ROTHERMEL: Just from a very normative standpoint of the law, if you're going to give someone notice and an opportunity to be heard as required by due process, you don't pick and choose what portions of the statute you want to put in a petition and go to a hearing on.

MS. CHEUVRONT: I would ask the court to take judicial notice that when someone files a guardianship under Title 20 or a custody action under Title 23, we don't allege each and every section of the statute for them to be operative,

THE COURT: Mr. Cherry.

[DPW's Counsel] MR. CHERRY: Just a little bit of a history. This is actually the third day we've been here. The first day was testimony back in February. At that time, the Judge made it clear to us that he wanted the Commonwealth to seek the least restrictive situation for [] Gant. We came back in March and **we orally modified what we were looking for**. There was a consent order being discussed amongst all the parties, and clearly, and I made it perfectly clear at that time, that I was operating under [Section] 304(c). So if nothing else, there was an oral motion at that time to proceed under that.

MS. CHEUVRONT: And **nothing was on the record**. There was no record. We went back into chambers. We were under the illusion we had an agreement and when the topic of how would [Mother] get paid, it all fell apart. That was the only component for which we could not agree.

MR. ROTHERMEL: Well, when I get into this case and I review the record --

MS. CHEUVRONT: You didn't review the record because it's right there.

MR. ROTHERMEL: Well, you just admitted that there was nothing on the record to give anybody any knowledge of [Section] 304.

MR. CHERRY: I think the previous counsel should have informed him of everything that occurred. However, I'm open to the fact that that may not have happened and he didn't have the history. But what was perfectly clear is **when we spent that entire second day here working on a consent order, it was operating under [Section] 304(c)**. **All the parties knew that we were operating under, including the Judge**, and we did leave here believing we had an agreement.

MR. ROTHERMEL: Well, one, **it's not on the record. And, two, anything about consent orders or negotiations are deemed irrelevant under the law**.

MR. CHERRY: **It's on the record now**.

. . . .

THE COURT: The question is now before this Court and as it developed is that we have consent -- it's really by request. This is still a voluntary proceeding, the underlying essence.

MS. CHEUVRONT: Yes. Request for waiver services.

THE COURT: [Gant] wanted services. [Gant] received services. There was a blip in the services that were being performed. She was hospitalized. She was brought back. She still is receiving services, but if I understand what the position is and what was brought to the Court's attention over the course of the two prior hearings, and I've never heard [Gant] saying that she wanted all services withdrawn. Today she said she wanted services withdrawn.

45

MS. CHEUVRONT: She did.

THE COURT: Once again, which brings right into my wheelhouse.

MS. CHEUVRONT: It does.

MR. ROTHERMEL: What I'm trying to show, Your Honor, is it's my understanding that the Commonwealth is trying to say that [Gant's] parents, and in particular[, Mother], is interfering with those services.

THE COURT: And she may have. I haven't found that as a fact yet which necessitated the filing of the emergency. You have an emergency order which is what was the basis of the [Section] 307(a)(1) relief that was at least initially granted on an emergency basis.

. . . .

MR. ROTHERMEL: So do I understand it then that the testimony that was provided in February when the Commonwealth presented [its] case in chief did not go towards things that were happening with regards to apparent interference with services?

THE COURT: It did up to a point --

MR. CHERRY: Up till February because that's when the hearing was. We couldn't have addressed anything after February.

. . . .

THE COURT: . . . **I think [Section] 304 is before the Court for me to decide** because this is an ongoing protective -- voluntary protective services case that ended up as an emergency and **right now it's back as a voluntary protective services case before the Court**. And I think it's in [Gant's] best interest that we know what's going on so an appeal is taken from whatever.

46

R.R. at 120a-123a (emphasis added).

It is clear from the face of the Petition and this exchange that the Petition was intended for relief pursuant to Section 307 of the Act, *i.e.*, for an order permitting DPW to direct Gant's medical care because she is an adult in need of protective services. At the hearing six months later, DPW claimed that Section 304(c) of the Act was inferred, and alternatively argued that it modified the Petition in the context of the settlement discussions in March 2014 to include Section 304(c) of the Act or, at the very least, midway through the June 2014 hearing.[44]

Notwithstanding, Pennsylvania Rule of Civil Procedure No. 1021(a) requires that: "Any pleading demanding relief **shall specify the relief sought**. Relief in the alternative or of several different types . . . may be demanded."[45] Pa.R.C.P. No. 1021(a) (emphasis added). "The party seeking the injunction must establish that (1) the right to relief is clear, (2) there is an urgent necessity to avoid an injury which cannot be compensated for by damages, **and** (3) greater injury will

---

[44] Gant's court-appointed counsel was present at the February and March 2014 court proceedings. The trial court's April 24, 2014 order approved Gant's request to replace Attorney Dunlevy Williams with Rothermel.

[45] In a case involving the Older Adults Protective Services Act, this Court has held:

> [T]he procedures mandated for petition practice under the Rules . . . provide sufficient safeguards to protect an older adult's constitutional right to notice and an opportunity to be heard. Pa.R.C.P. [No.] 206.2 provides for answers to be filed to petitions. Implicit in Rule 206.2 is that the respondent be given notice of the petition so as to be able to respond in an answer. The Rules also provide for such procedures as court[-]ordered discovery regarding disputed issues of fact, evidentiary hearings and argument by the parties. *See* Pa.R.C.P. [No.] 206.5 through 206.7.

*In Interest of M.B.*, 686 A.2d 877, 882 (Pa. Cmwlth. 1996) (italics added).

47

result in refusing rather than granting the relief requested." *Big Bass Lake Cmty. Ass'n v. Warren*, 23 A.3d 619, 626 (Pa. Cmwlth. 2011) (emphasis added). Each of the above requirements must be satisfied before an injunction will be ordered. *Id.* The Petition does not request or even reference injunctive relief or the legal criteria necessary to establish a right thereto.

> Further,

> An appellate court is limited to considering only those facts that have been duly certified in the record on appeal. For purposes of appellate review, that which is not part of the certified record does not exist. Documents attached to a brief as an appendix or reproduced record may not be considered by an appellate court when they are not part of the certified record.

*B.K. v. Dep't of Pub. Welfare*, 36 A.3d 649, 657 (Pa. Cmwlth. 2012) (citations omitted). Moreover, Pennsylvania Rule of Evidence (Pa.R.E.) 408(a) states:

> Evidence of the following is **not admissible**--on behalf of any party--either to prove or disprove the validity . . . of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

> (1) furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--**a valuable consideration in compromising or attempting to compromise the claim**; and

> (2) **conduct or a statement made during compromise negotiations about the claim**.

Pa.R.E. 408(a) (emphasis added). Section 6141(c) of the Judicial Code also provides: "Except in an action in which final settlement and release has been pleaded as a complete defense, any settlement or payment referred to in subsections (a) and (b) [relating to personal injuries and property damage] shall not

48

be admissible in evidence on the trial of any matter." 42 Pa.C.S. § 6141(c). This Court has explained:

> 'The general rule is that an offer to compromise is not admissible in evidence at trial as an admission that what is offered is rightfully due or that liability exists.' *Rochester Mach. Corp. v. Mulach Steel Corp., . . .* 449 A.2d 1366, 1368 ([Pa.] 1982). An offer to compromise is generally defined 'as the settlement of differences by mutual concessions; an adjustment of conflicting claims.' *Id.*

*Hooker v. State Farm Fire & Cas. Co.*, 880 A.2d 70, 85 (Pa. Cmwlth. 2005).

Finally, "the basic elements of procedural due process are **adequate notice,** the opportunity to be heard**, and the chance to defend oneself** before a fair and impartial tribunal having jurisdiction over the case." *Commonwealth v. Turner*, 80 A.3d 754, 764 (Pa. 2013), *cert. denied*, ___ U.S. ___, 134 S. Ct. 1771 (2014) (emphasis added). Excluding reference to purported settlement negotiations and looking only at the Petition and the certified record, we must conclude that DPW intended the Petition to obtain and Gant understood that DPW was seeking "an [o]rder permitting [DPW] to continue to direct [Gant's] health care pending a hearing[,]" and nothing more. R.R. at 8a. Placing the amendment on the record during the June 2014 hearing **after** Gant had testified hardly afforded Gant sufficient notice to prepare a proper defense. Thus, we hold that Gant was not afforded adequate notice that the Petition sought an injunction pursuant to Section 304(c) of the Act.

#### 4. **Due Process Afforded**

Gant argues that DPW and the trial court deprived her of her due process rights. She specifically argues that the Petition fails to specify "how she

49

was at immediate risk," why involuntary protective services were necessary, the period for which they were required or what services were necessary to remove the conditions creating the need. Gant Br. at 32.

In order to determine whether the basic elements have been met, "[the] courts examine procedural due process questions in two steps: the first asks whether there is a life, liberty, or property interest that the state has interfered with; and the second examines **whether the procedures attendant to that deprivation were constitutionally sufficient**." *Turner*, 80 A.3d at 764 (emphasis added). Here, because there is no question that Gant's life and liberty are at issue, this Court need only determine whether the procedures afforded her were sufficient.

In its Petition, DPW requested "an [o]rder permitting [DPW] to continue to direct [Gant's] health care pending a hearing" to determine whether she was an adult in need of protective services. R.R. at 8a. Based upon the history, as reflected in the incorporated October 2013 emergency guardianship petition and order, the trial court determined that, pursuant to Section 307(a) of the Act, DPW's guardianship should continue until it could hear evidence. It is unclear why it took the trial court until January 31, 2014 to schedule the protective services hearing, or why after the March 2014 settlement negotiations were unsuccessful the trial court scheduled the rest of the hearing some three months later, and then only after Father moved the Court to do so. Nevertheless, there is nothing in this record that reflects that Gant was not notified of the Petition or the hearings, or that she did not have the opportunity to be heard or to defend herself before the trial court. *Turner*.

Moreover, Gant's claims that the Petition was deficient are without merit. We acknowledge that the Act does not specify what the Petition should contain, that DPW has yet to promulgate regulations in that regard and that the

50

nearly identical Older Adults Protective Services Act's petition requirements are illustrative. Section 15.72 of DPW's Regulations under the Older Adults Protective Services Act provides:

(a) *Contents.* The petition which the agency files for an emergency court order of involuntary intervention shall state the following information:

(1) The name, age and physical description of the older adult insofar as these facts have been ascertained.

(2) The address or other location where the older adult can be found.

(3) The name and relationship of a guardian, caregiver or other responsible party residing with the older adult, when applicable.

(4) A description of how the older adult is at imminent risk of death or serious physical harm.

(5) The physical and mental status of the older adult, to the extent known.

(6) The attempts made by the agency to obtain the informed consent of the older adult, or the older adult's court appointed guardian, when applicable, to the provision of protective services by the agency.

(7) The specific short-term, least restrictive, involuntary protective services which the agency is petitioning the court for an order to provide.

(8) A description of how the proposed services would remedy the situation or condition which presents an imminent risk of death or serious physical harm.

(9) A statement showing why the proposed services are not overbroad in extent or duration and why less restrictive alternatives as to their extent or duration are not adequate.

(10) A statement that other voluntary protective services have been offered, attempted or have failed to remedy the situation.

(11) A statement that reasonable efforts have been made to communicate with the older adult in a language the older adult understands in the case of an older adult who is hearing impaired or who does not understand the English language.

(12) Other relevant information deemed appropriate by the agency.

. . . .

(c) *Affidavits.* Allegations which are not based upon personal knowledge shall be supported by affidavits provided by persons having that knowledge. The affidavits shall be attached to the petition.

(d) *Emergency order duration.* In the petition, the agency shall request an emergency order of a specific duration which may not exceed 72 hours from the time the order is granted. The agency shall request the court of common pleas to hold a hearing when the initial emergency order expires to review the need for an additional emergency court order or other continued court and protective services involvement, or both. The issuance of an emergency order is not evidence of the competency or incompetency of the older adult.

6 Pa. Code § 15.72.

Applying the relevant portions of the Older Adults Protective Services Act and its attendant Regulations to this case, we hold that the Petition afforded Gant adequate notice of DPW's claims of imminent risk, why involuntary protective services were necessary, the period for which they were required and what services were necessary to remove the conditions creating the need, and that she had sufficient opportunity to defend herself from those claims. Thus, with the

exception of inadequate process afforded Gant regarding DPW's purported injunctive relief request, we hold that DPW and the trial court did not deprive Gant of her due process rights.

Based upon the foregoing, Paragraph (2) of the trial court's order is vacated. The trial court's ruling that Gant is an adult in need of protective services is reversed. The remaining portions of the trial court's order are affirmed.

_____
ANNE E. COVEY, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Department of Public Welfare          :
                                      :
                    v.                :
                                      :
Mikeisha Gant,                        :          No. 1652 C.D. 2014
                    Appellant         :

O R D E R

AND NOW, this 29th day of June, 2016, Paragraph (2) of the Lancaster County Common Pleas Court's July 8, 2014 order is vacated. The trial court's ruling that Mikeisha Gant is an adult in need of protective services is reversed. The remaining portions of the trial court's order are affirmed.

_____
ANNE E. COVEY, Judge